William **GASPERINI**, Plaintiff,

v.

**THE CENTER FOR HUMANITIES, INC., Defendant.**

**No. 93 Civ. 7204(CLB).**

United States District Court, S.D. New York.

July 29, 1997.

Samuel A. Abady, Abady Luttati Kaiser Saurborn & Mair, P.C., New York City, Jonathan S. Abady, Beldock Levine & Hoffman, P.C., New York City, for Plaintiff.

Francis A. Montbach, Mount, Cotton & Wollan, New York City, for Defendant.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

Before this Court for decision in this diversity case controlled by New York law is Defendant's renewed motion pursuant to Rule 59 F.R.Civ.P. for a new trial unless Plaintiff consents to a remittitur in an amount to be fixed by this Court. Defendant asserts that the jury verdict of $450,000.00 was excessive.

We are called upon to revisit this issue by reason of the decision of the Supreme Court, *Gasperini v. The Center for Humanities, Inc.,* —— U.S. ——, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Our Court of Appeals has remanded the case to this Court for further proceedings in conformity with the opinion of the Supreme Court. *Gasperini v. The Center for Humanities, Inc.,* 95 F.3d 3 (2d Cir.1996).

The case involves the loss by Defendant of 310 original photographs in the form of slide transparencies. These photographs were taken by Mr. Gasperini in Central America, while employed as a print journalist, and had been submitted to The Center for Humanities in 1990 for the purpose of having the Center select those most useful to be included in its videotape production entitled "Conflict in Central America: An Historical Commentary." Mr. Gasperini, during seven years in Central America, took over 5,000 slides depicting active war zones, political leaders, and scenes from daily life. Many of these were taken at risk of his life. He selected 300 slides for The Center, and his mother turned over ten additional slides in the Fall of 1991. Accordingly, the 310 slides which are lost represent an editorial selection out of some 5,000 slides, chosen primarily for their relationship to the topics covered by the video. Mr. Gasperini also wrote material for the video. Out of this number of 310 preselected slides, the Center chose and used 110 transparencies for its video. The video survives and was in evidence at the trial. The remaining slides are missing and therefore not available for first-hand consideration or examination by the trier of fact to determine their market value, although secondary evidence concerning these missing slides was in the possession of our trial jury.

The Supreme Court decision in this case represents an extension of *Erie* doctrine, or more likely a reversion by the Supreme Court to prior *Erie* doctrine since abandoned, of which *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) is the outstanding example. The Supreme Court in *Guaranty Trust* and again in *Gasperini* seems to have endorsed the outcome-determinative test to determine whether a disputed point of law is *procedural,* and therefore governed by the Federal Rules of Civil Procedure and case law developed thereunder, or *substantive* so as to be governed by state law. This case also involves the interplay of the Seventh Amendment to the United States Constitution with procedural rules in New York and other states, where the Seventh Amendment is not applicable, and jurors are held in lower esteem than is the federal tradition.

■ The Supreme Court held essentially that in reviewing a jury verdict for inadequacy or excessiveness, the court in a diversity case must use the same standard used by the state court. Prior to 1986, state and federal courts in New York generally, "invoked the same judge-made formulation in responding to excessiveness attacks on jury verdicts: courts would not disturb an award unless the amount was so exorbitant that it 'shocked the conscience of the court.'" (*Gasperini,* at —— U.S. ——, at 116 S.Ct. 2217)

■ In 1986, as the Supreme Court pointed out, New York codified a standard for judicial review of the size of jury awards. Although this legislation, found in New York C.P.L.R. § 5501(c) appears on its terms to apply only to a decision by the Appellate Division of the New York Supreme Court, and then only in the case of a judgment "in which an itemized verdict is required", the New York courts, including the trial courts, have adapted the new language to apply to all motions for additur and remittitur whether or not the verdict is itemized, and in the trial courts as well as on appeal.[1] As is pointed out by Professor David D. Siegel in

1. Section 5501(c) reads in relevant part as follows: The appellate division shall review questions of law and questions of fact on an appeal from a judgment or order of a court of original instance and on appeal from an order of the Supreme Court, a county court or an appellate term determining an appeal. In reviewing a money judgment in an action in which an itemized verdict is required by rule forty-one hundred eleven of this Chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

his commentary published as part of McKinney's Consolidated Laws of New York Annotated at § C5501:8 *et seq.,* the trial court in making a ruling "merely grants a motion for a new trial made by the aggrieved party on the ground of the inadequacy or excessiveness of the verdict 'unless' the defendant agrees to pay a higher sum (additur) or the plaintiff agrees to accept a lower sum (remittitur) than the verdict."

■ The Supreme Court in *Gasperini* noted (fn. 3 at —— U.S. ——, at 116 S.Ct. 2217), "the legislature sought, particularly, to curtail medical and dental malpractice and to contain 'already high malpractice premiums' ", Legislative Findings and Declaration, Ch. 266, 1986 N.Y. Laws 470 (McKinney).

■ One would think that a verdict that "deviates materially from what would be reasonable compensation" would also "shock the conscience" of a judge reviewing a verdict. However, as the Supreme Court noted in *Gasperini, id.* at ——, 116 S.Ct. at 2218, the New York state court opinions confirm that § 5501(c)'s "deviates materially standard calls for closer surveillance than shocks the conscience oversight. (citations omitted)" See also 7 *J.Weinstein, H. Korn & A. Miller, New York Civil Practice,* ¶ 5501.21, p. 55–64: "under [§ 5501(c)]'s new standard, the reviewing court is given greater power to review the size of a jury award than had heretofore been afforded." Although the New York statute gives the appellate court the power and obligation to review verdicts under this new consciousness raising standard, it is now settled law that trial courts in New York first conduct the "materially deviates" inquiry and apply the statute to requests for remittitur and additur with the same force as the appellate division, the only court authorized by the statute to do so.

In a post-*Gasperini* case, our Court of Appeals in *Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 18 (2d Cir. 1996) contrasted the federal question standard that an award is excessive if it shocks the judicial conscience, with Ohio law in which the standard is "damages awarded are so high that to permit the award to stand would be a denial of substantial justice" and held that the Ohio standard for excessiveness

is "generally similar to the federal standard." We think that the situation as to Ohio is the same as in New York, but recognize that the Supreme Court of the United States has held otherwise.

■ Few New York cases have actually applied Section 5501 and there is little authority as to how this should be done. Most such cases involve personal injury awards for pain and suffering. We are cautioned that we should not look at awards in other cases "for *stare decisis* purposes, since each requires *sui genesis* determination." *Levine v. East Ramapo Cent. Sch. Dist.,* 192 A.D.2d 1025, 597 N.Y.S.2d 239 (3d Dept.1993), cited with approval at New York Juris. Damages § 133. Also, "great deference" must be accorded to the jury's interpretation and review should be done sparingly. *See, e.g. Fares v. Fox,* 198 A.D.2d 396, 603 N.Y.S.2d 892 (2d Dept.1993), *Rubin v. Aaron,* 191 A.D.2d 547, 594 N.Y.S.2d 797, 799 (2d Dept. 1993); *Preston v. Young,* 657 N.Y.S.2d 499, 502 (3d Dept.1997); *Santalucia v. County of Broome,* 228 A.D.2d 895, 644 N.Y.S.2d 408, 410 (3d Dept.1996); *Daversa v. PTC Properties,* 165 Misc.2d 345, 632 N.Y.S.2d 740 (1st Dept.1995).

■ The *Gasperini* decision in the Supreme Court. as noted earlier, does no more than change the standard for when a remittitur should be ordered. It does not tell us how to go about computing the amount of the remittitur. This Court concludes that a mere averaging of other cases involving other awards for the loss of other photographs would not be an appropriate way to fix the amount of the remittitur. Rather, this court should follow existing Second Circuit precedent in fixing the amount. This requires us to "reduce the verdict only to the maximum that would be upheld by the trial court as not excessive." *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328 (2d Cir.1990). This is the least intrusive standard. Our Court of Appeals held in *Earl:*

"Some courts have employed the least intrusive standard, holding that the remitted amount should reduce the verdict only to

the maximum that would be upheld by the trial court as not excessive.

\* \* \* \* \* \*

The benefits of this standard are significant. Compared to the alternatives, it is the most faithful to the jury's verdict. Moreover, the plaintiff is unlikely under this standard to opt for a second trial. Once the remittitur is calculated, the plaintiff becomes fully informed of the maximum award that the district court would permit any jury to return in that particular case."

See also, Niemann v. Whalen, 928 F.Supp. 296, 299 (S.D.N.Y.1996); In re: Joint Eastern and Southern District Asbestos Litigation, 827 F.Supp. 1014, 1059 (S.D.N.Y.1993), Mendoza v. City of Rome, 872 F.Supp. 1110, 1126 (N.D.N.Y.1994).

 In fixing the amount of the remittitur in this case, we should consider what our trial jury considered, namely the actual facts of this case, rather than prior lost photograph cases essentially involving professional libraries which make photographs available without any editorial commitment on the part of the photographer, or any pre selection except by topic.

As appeared at the trial, such libraries have, by terms of their printed forms of receipts, provided for a liquidated sum for lost photographs, generally pegged at $1,500.00 per lost slide, wholly without regard to the quality or significance of the particular photograph lost, or whether it is a unique depiction contrasted with a commonplace picture of forests and waterfalls. Mr. Gasperini's collection included both unique scenes and the commonplace. While this particular transaction did not incorporate the agreed customary $1,500.00 payment, and therefore that amount is not binding on either party to this litigation, the practice of commercial people dealing with slides, of fixing the value of a lost slide by agreement at $1,500.00, is some evidence of the value of slides generally. Reasonable persons chose as a regular matter to incorporate such a valuation in their bailments recognizing how difficult it is to prove the value of a work of art, especially a photograph which cannot be examined by the jury or replicated.

 The measure of Plaintiff's damages in this case is the market value of the slides at the time they were lost. This value is reflected in what a willing buyer under no compulsion would pay to a willing seller, each fully informed in the matter. The market value of the photographs also is affected by the potential for licensing single uses of the product during the life of the copyright, which is fifty years plus the lifetime of the author.

Mr. Gasperini had an unusual background of training and experience as a print journalist who took photographs mostly as a side interest. On occasion, Mr. Gasperini's photographs were used commercially by his employer and others, and although photography was not his main business, he did have a record of earning money from his photographs. The evidence at trial was uncontradicted that Mr. Gasperini, upon the completion of his tour of duty as a journalist, plans to retire and write one or more books about his life experiences. These books would center around the use of his photographs.

In addition to employment with the Christian Science Monitor, Mr. Gasperini has worked with CBS News and has been employed by United Press International, The Canadian Broadcasting Corporation, Reuters News Service, The Oakland Tribune, and The Kansas City Star. He is fluent in Portuguese, French, Russian and Spanish, as well as English, and has served in his profession all over the world. His photographs have been used in newspapers and magazines, and some of his work has been displayed in galleries solely for its art value, wholly apart from the pictures' coverage of current or historic events.

We have previously noted that the images lost represented the culmination of Mr. Gasperini's work in Central America, collected over a seven year period, edited by him from a group of some 5,000 photographs. Some of the photographs concern war scenes involving the Contras and the Sandinistas, and others were taken in remote regions of the Central American mountains. Included in the loss are photographs taken by Mr. Gas-

perini while he was held a hostage of the Contras in the Nicaraguan jungle, and while he was under fire from helicopter gun ships in El Salvador. They include major historical figures at scenes of historical interest and portray the vivid aftermath of war. Most of the photographs represent scenes and images which are impossible to recreate. The jury had a right to consider the superior quality of Mr. Gasperini's work, and the uniqueness of the lost slides as well as the fact that most of them were irreplaceable.

Defendant's witness, Mr. Goodman, testified that Mr. Gasperini was the only photographer he knew who had a body of work covering the recent strife in Central America. That the photography was of professional quality is apparently not contested, and supported by the expert testimony of the witness Kuebler. As Mr. Kuebler testified "[Mr. Gasperini] gets to places where no one else goes, where our [Gannett Publications] staff couldn't get." Ms. Green, a consultant for defendant and producer of the videotape, described the lost work as "wonderful", and defendant's chief executive expressed much the same view. Our jury received a written description of the contents of the lost photographs (Plaintiff's Exhibit 31), and saw examples of Mr. Gasperini's other work in other places, including Tibet, Nepal, India, Pakistan, Sri Lanka, the Gulf War, and Russia.

The video series *"Conflict in Central America: An Historical Commentary"* is a three volume examination of the contemporary social, political, and economic history of Central America as of 1991. In examining the current situation in Central America, the video gives a cursory explanation of the geographic features of the region and then delves into its social, political, and economic history. At its conclusion, the video attempts to determine the future course of social, political, and economic development in Central America in light of the region's history.

Physically, the video is comprised of still photographs of various scenes of Central American life and clips drawn from newsreels and documentaries. A narrator lectures during these montages, explaining the history of the region. Interspersed throughout the montage and the narrator's commentary, are interviews conducted with Central American and American political operatives and with American academics. The videos run for a total length of approximately forty minutes.

Volume One of the series is entitled "Life in Central America". This volume examines the history of the peoples of the region. This volume begins by discussing the indigenous cultures of the region, the effects of the Spanish and British Colonial conquests of the region, and how the clash of these cultures has contributed to the current conflict in Central America. In conducting this discussion, this volume traces the influence of Roman Catholicism on the region, refers to the arrival of African Slaves to the colonies, and the later revolution which ended Spanish colonial rule, the development of the Hacienda system, and how this system created a great disparity in wealth between the small number of wealthy Hacienda owners and the vast majority of campesinos who worked the land. The video goes on to discuss the power wielded by the military in preserving the inequitable status quo, as well as the role foreign companies like United Fruit played in propping up various governments for the purpose of maintaining political stability so as to maximize profits, often at the expense of the campesinos' human rights.

The video posits that historical development in Central America has created an inequitable situation in the region whereby a tiny minority holds an enormous amount of the land and wealth, while the vast majority of Central Americans barely subsist on what little land and wealth is left over.

In conclusion, Volume One examines Costa Rica, which is unique among Central American countries in that it did not originate as a plantation colony. The video hypothesizes that Costa Rica has developed into a strong democracy with deep democratic roots and traditions because no Haciendas were ever built in Costa Rica, and thus, no great disparity in wealth ever developed there.

Volume Two is entitled "Turmoil of the 80s". This video examines the civil wars

which racked Central America during the 1980's. In conducting this examination, the volume traces the historical developments of the various conflicts. Volume Two first examines the Civil War in Guatemala. The video argues that the communist insurgency in Guatemala arose as the result of an American-backed coup in 1954 which toppled President Arbenz, whose agrarian reforms had threatened the power and holdings of the hacienda owners and foreign corporations such as United Fruit. The video posits that American intervention in Guatemala and other Central American nations can be traced to the Monroe Doctrine and the Roosevelt Corollary, as well as economic imperialism.

The video then discusses the civil war that was fought in Nicaragua. The discussion begins with an examination of the United States' seven-year, armed intervention in Nicaragua, which began in the late 1920's. The intervention was done for the purpose of quelling a popular uprising lead by Augusto Sandino.[2] After the United States withdrew from Nicaragua, Sandino was assassinated at a peace talk by Anastasio Somoza. Somoza and his children then ruled Nicaragua with the support of the United States. The video claims the Somozas amassed great wealth at the expense of the Nicaraguan people until they were toppled by the Sandinistas in 1979.

The video than gives a cursory explanation of how the Sandinistas turned Nicaragua into a communist state that allied itself with Cuba and the Soviet Union. The video then gives another cursory account of the various abuses thereafter committed by the Sandinistas, particularly the forcible resettlement of the Miskito Indians from their homeland. The video than examines how the Reagan Administration sponsored an armed insurgency that became known as the Contras. It then examines the Civil War in El Salvador. The video argues that right-wing forces and death squads were largely responsible for the heinous acts committed against civilians during this war, and concludes by stating that the protracted and bloody conflicts waged in Central America have left the people there even poorer than they were, and forced the

respective governments in the region to seek a peaceful resolution to these conflicts.

Volume Three is entitled "Prospects for Peace". This video examines the 1986 Peace Accords signed by the various Central American nations largely through the efforts of Costa Rican President and 1987 Nobel Peace Prize Winner Oscar Arias. The video examines the effect these accords have had on the region, including the cessation of hostilities in El Salvador, Nicaragua, and Guatemala, and the defeat of the Sandinista Regime in democratic elections. The video concludes by arguing that Central America must break with its past history in order to achieve a peaceful and prosperous future.

This video series is a serious and scholarly examination of the social, political, and economic situation in Central America. Accordingly, it is not appealing to a mass audience, and can probably only be sold to a very small market consisting of educational institutions and academics whose studies focus on Central America. Moreover, the tone is occasionally strident and anti-American. This probably served to reduce the sales in the already restricted market for which this educational video was created.

Accordingly, this Court attaches little weight to the claim made by Defendant that the video was not profitable, and that such unprofitability reflects poorly on the quality of Mr. Gasperini's work or the merchantability of his slides. Whatever the reason, this unprofitability was not attributable to any failure of the quality or significance of the photographs or any fault or omission on the part of the Plaintiff.

It is uncontradicted on our trial record that the sales potential of a photograph does not diminish with the death of the photographer; that individual images have been rented for single use for rates as high as $30,-000.00; historic photographs remain in stock forever and may be reused again and again, and the agreed fee relates as much to the content of the photograph as it does to the reputation or status of the photographer. See generally the trial testimony of witnesses Kinne and Zentmeier.

2. The Sandinistas derive their name from this revered martyr.

This Court instructed the jury consistent with New York law that in evaluating the lost photographs they should consider: (1) the ability, experience and knowledge of the photographer; (2) the reputation of the photographer; (3) the content and subject matter of the lost slides; (4) the extent and nature of the demand in the market for the use of pictures of this particular type and content; (5) prior licensing fees collected and the prior economic experience of the photographer in connection with the slides; (6) the extent and nature of the efforts to exploit the economic value of the transparencies, as well as potential competition or alternative sources for similar or substitute photography; and (7) the potential use of the slides for the purpose of writing a book about Central American politics or history, all to lead to determining the value of the slides over the life of the copyright.

While most of the photographs lost were select and classic images which can never be replaced because the historical and physical conditions under which they were taken have ceased to exist, it is also true that some are simply beautiful shots of trees, hills, and waterfalls which are essentially replaceable or generic. Because we are dealing with works of art, the other cases involving lost transparencies are of slight help. A number of cases have set the value of lost slides at $1,500.00 each, consistent with the decision reached by our trial jury. *See, e.g., Girard Studio Group v. Young & Rubicam,* 147 A.D.2d 357, 536 N.Y.S.2d 790 (1st Dept.1989) and *Hoffman v. Porto Gallo, Inc.,* N.Y. Supreme Court, February 16, 1987, *Schneps v. Grunfeld Graphics International Ltd.,* N.Y.

County Civil Court, February 27, 1990, and additional cases cited by Plaintiff in connection with the submission of this motion. Other cases have supported damage awards far less. Obviously, each is restricted to its particular relevant facts.

It is true that when the jury verdict was first received, this Court, although perceiving the amount of the verdict was high, denied relief under Rule 59, by an oral decision, operating under the old, federal, "shocks the conscience" standard. Steeped as we were in the mystique of the Seventh Amendment, federal judges hesitated to tamper with jury verdicts, while long prior to 1986, when the standard was changed in New York, our New York counterparts were reducing and adding to verdicts all the time.[3]

It is also true that our Court of Appeals previously has set the remittitur in this case at $100,000.00. While that conclusion must be considered, it is entitled to little weight because the attorneys did not argue the issue of amount, and the exhibits in evidence, which are most critical in evaluating damages, were not even sent to the Court of Appeals, nor were they requested by that Court.[4]

Assessing the evidence bearing on the value of the missing slides, and relying on the same principles of law by which the original trial jury was instructed, this Court finds that the following slides and all slides similar in content may be valued reasonably at amounts equal to or in excess of the average $1,500 figure per slide contended by Plaintiff and apparently found by the jury.

---

3. Most federal judges as a matter of practical case administration soon learned of the necessity to "run an honest roulette wheel." Jury verdicts have tended in recent years to become more and more aleatory. Indeed "trial by jury is part of the remedy." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 360, 82 S.Ct. 780, 783–84, 7 L.Ed.2d 798 (1962). If trial judges are too quick to relieve litigants from losing before a trial jury, there is far less incentive to settle cases.

4. Under Local Civil Rule 39.1(a) formerly numbered 24(a), (d), also in effect in the Eastern District of New York, trial exhibits are not filed with the Clerk of Court but "shall be retained in the custody of the respective attorneys who pro-

duced them in court." Accordingly, although the Court file is assembled and sent up on appeal as a matter of routine, exhibits not filed in the district court are not sent unless a party makes appropriate arrangements. See Rule 19(a) F.R.App.P., which limits the record on appeal to "exhibits filed in the district court." Rule 11(g) of the Local Rules of the Second Circuit which requires the parties to an appeal to agree upon or designate unilaterally the exhibits "considered to be necessary" apparently was not complied with on the prior appeal in this case. In any event, the appellate panel which selected the initial remittitur figure of $100,000.00 never saw the video or the list describing the lost slides (Ex. 31).

The military combat slides

The Miskito and Sumo Indian Slides

The Sandinista rallies

The nine top Sandinista Commanders and Thomas Borge addressing crowds

Trench digging and scenes of poverty in Managua, Leon and Chinindega

Fidel Castro dedicating sugar mill and Cuban military advisors present

Army soldiers on guard after March 1984 elections, interrogating young prisoner

Soldiers checking documents at Chalatenango, army patrol and Morazan Province

Uncovering booby trap

Photographs of Guerrillas near Guazapa volcano

Battle scenes in San Salvador offensive in November 1989, including dead Guerrillas

Burned out buildings, etc. at Morazan

Refugees in Morazan and San Salvador, 1985

Guerillas in Tenanzingo

Aftermath of bombing in El Salvador

Sheraton Hotel in San Salvador under control of Guerrillas, showing American Green Berets trapped inside

Army soldiers retreating at San Salvador

British journalist shot and killed in San Salvador, and nine related slides (10 slides)

General shots taken of people in San Salvador and view of tomb of murdered Archbishop Romero, with church marchers

Pictures of U.S. National Guardsmen training in Honduras, April 1995

Military exercises near Nicaraguan border showing United States' participation

Helicopters

Secret mountaintop military base at Isla de Tigra

Child holding peace dove in San Jose, Costa Rica

Guatamala pictures of Ixil Triangle

U.S. soldiers on patrol in Panama City

Noriega goon squads attacking opposition candidates

President Chamorro meeting with Contra leaders and embracing leader known as Franklin

This Court's examination has isolated about seventy of the 310 slides which do not appear to be quite so significant as the rest. These slides include portraits of campesinos, landscapes, volcanoes, people engaged in their daily tasks, cultural and sports scenes, Mayan ruins and similar generic shots, as well as pictures of frequently photographed public figures such as Oscar Arias, Daniel Ortega, Belote, Chamorro, Noriega, Duarte, Cerezo and George Bush. These slides, and these alone of the lost slides, seem readily replaceable and available from other sources. A reasonable jury should not value these generic slides in excess of an average of $200.00 per slide.

Upon the foregoing rationale, this Court concludes that the sum of $375,000.00 represents the maximum award which a jury could give without deviating materially from what would be reasonable compensation.

The motion for a new trial is granted unless Plaintiff's attorney files with the Clerk of the Court on or before September 15, 1997 an acceptance of a remittitur of $75,000.00 of the judgment filed herein, with appropriate adjustment for prejudgment interest. In the event of a failure to do so within the time permitted, a new trial will be scheduled on a date to be set by the Court.

SO ORDERED.