**Boris RAISHEVICH, Plaintiff,**

v.

**Charles FOSTER, an officer of the New York State Police, Defendant.**

**No. 95 Civ. 3153 (WCC).**

United States District Court, S.D. New York.

July 17, 1998.

Michael Kennedy, P.C., New York City
(Simone Monasebian, of counsel), for plain-
tiff.

Dennis C. Vacco, Attorney General for New York State, New York City (Bruce A. Brown, Assistant Attorney General, of counsel), for defendant.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

On May 27 and June 1, 1998, this Court conducted a bench trial on the issue of damages in this civil rights action under 42 U.S.C. § 1983. This opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### BACKGROUND

Over the course of approximately fifteen years, plaintiff Boris Raishevich developed a collection of photographic transparencies of cannabis, or marijuana, plants. On November 5, 1993, state police officers arrested Raishevich and seized numerous items from his home. Among these items were 59 marijuana plants, bags containing over four pounds of marijuana, and 347 cannabis transparencies from Raishevich's collection. On October 6, 1994, Raishevich pled guilty to criminal possession of marijuana and was fined $500. Despite Raishevich's request for return of the seized transparencies, they were destroyed while in police custody by defendant Charles Foster, a state police officer.

In this action, Raishevich seeks compensatory damages reflecting the fair market value of the destroyed transparencies, as well as costs and attorney's fees. Because defendant conceded liability, the two-day bench trial involved solely the issue of damages.

### DISCUSSION

I. *Measure of Damages*

■ The basic measure of Raishevich's damages is the market value of the transparencies at the time they were destroyed. "This value is reflected in what a willing buyer under no compulsion would pay to a willing seller, each fully informed of the matter. The market value of the [transparen-

cies] is also affected by the potential for licensing single uses of the product during the life of the copyright, which is fifty years plus the lifetime of the author." *Gasperini v. Center for Humanities, Inc.,* 972 F.Supp. 765, 769 (S.D.N.Y.1997), *vacated on other grounds,* 749 F.3d 137 (2d Cir.1998).

■ The primary considerations in determining market value are (1) the uniqueness of the transparencies, and (2) the photographer's earning potential from use of his transparencies. *See Gasperini,* 149 F.3d 137, 140; *Gasperini v. Center for Humanities, Inc.,* 66 F.3d 427, 428–29 (2d Cir.1995), *vacated on other grounds,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Blackman v. Michael Friedman Publ'g Group, Inc.,* 201 A.D.2d 328, 328, 607 N.Y.S.2d 43, 44 (1st Dep't 1994); *Nierenberg v. Wursteria, Inc.,* 189 A.D.2d 571, 572, 592 N.Y.S.2d 27, 28 (1st Dep't 1993); *Alen MacWeeney, Inc. v. Esquire Assocs.,* 176 A.D.2d 217, 218, 574 N.Y.S.2d 340, 341 (1st Dep't 1991). Factors bearing on earning potential include: (a) past earnings from use of the transparencies; (b) the expertise and reputation of the photographer; (c) the extent and nature of the market demand for the use of the particular type of photos; (d) the extent and nature of the photographer's efforts to exploit the economic value of the transparencies; and (e) potential competition or alternative sources of similar photographs. *See Gasperini,* 972 F.Supp. at 772.

■ Although Raishevich bears the burden of proving damages with reasonable certainty, "[t]he need for specificity in proving damages is mitigated ... by the principle that when there has been a clear showing of some injury, and damages are not susceptible of precise measurement because of defendant's conduct, a fact finder 'has some latitude to make a just and reasonable estimate of damages based on relevant data.'" *J.M. Studio, Inc. v. Federal Express Corp.,* No. 89–3550, 1991 WL 7672, at *4 (S.D.N.Y. Jan. 22, 1991) (quoting *Electro–Miniatures Corp. v. Wendon Co.,* 771 F.2d 23, 27 (2d Cir.1985) (internal quotation marks omitted)).

## II. *Uniqueness*

In assessing the uniqueness of a photograph, courts have considered both its subject matter and cost of replacement. *See, e.g., Gasperini,* 972 F.Supp. at 769–72 (discussing subject matter); *MacWeeney,* 176 A.D.2d at 218, 574 N.Y.S.2d at 340 (discussing replacement cost). Unlike a fleeting historical event, which by definition is incapable of recreation, cannabis plants are by their very nature capable of reproduction. *Cf. Gasperini,* 972 F.Supp. at 772 ("While most of the photographs lost were select and classic images which can never be replaced because the historical and physical conditions under which they were taken have ceased to exist, it is also true that some are simply beautiful shots of trees, hills, and waterfalls which are essentially replaceable or generic."). Although even a physically reproducible subject may be deemed unique if reproduction would require great effort, time, and expense, Raishevich offered no evidence as to the effort he expended or the expenses he incurred in amassing his collection of cannabis transparencies. There is no evidence that he traveled the globe to find rare cannabis specimens, and it appears likely that many of the transparencies were created by photographing cannabis plants he had raised at his own home.

## III. *Earning Potential*

### A. *Past Earnings*

At trial, Raishevich offered little evidence of past earnings from use of his cannabis transparencies. In evidence are approximately ten photos that appeared in High Times, a magazine devoted to the raising of marijuana and issues related thereto. These photos are credited to either "Elmer Budd" or "Budd Greenberg," which Raishevich testified were his professional aliases. The only proof of compensation for such work are a few art contracts, check request forms, and check stubs produced by one of his witnesses, John Holmstrom, who at various times has been the publisher, editor, and multimedia director of High Times. These pieces of evidence indicate that Raishevich received $200 for a cannabis image published in the October 1991 issue of High Times and

reproduced in the 1993 issue of "The Best of High Times;" $200 for an image appearing in the May 1998 issue; and $400 for an image published in the June 1998 issue.

The Court notes, however, that evidence of the latter two payments was produced long after this litigation had commenced. Whereas the contract for the 1991 use explicitly permitted High Times to republish the cannabis image in a "Best Of High Times" issue for no additional fee, identical form language in the contracts for the May and June 1998 uses was crossed out and substituted with handwritten language stating "one time use." There has been no explanation why the payments made after this litigation had commenced effectively doubled or quadrupled Raishevich's fee. The fees and amended contract language may have been agreed upon with an eye toward this case, and thus are somewhat suspect as evidence of the value of the transparencies.

Raishevich's other profferings prove little. The check requests and art contracts referring to an "Arrowhead Ranch" assignment show only that High Times employed Raishevich for some on-location photographic work; they have no demonstrable connection to any use of his cannabis transparencies.

In addition, much was made at trial of a $5000 loan from High Times to Raishevich to cover the costs of his criminal defense on the charge of marijuana possession. Raishevich contended that he repaid this loan by allowing High Times to publish his cannabis images; thus, he argued, the loan constituted $5000 in income from High Times' use of the transparencies. Although Raishevich and Holmstrom testified that the loan was in fact paid off in this manner, they could not clearly identify which uses, and how many uses, were counted against the loan. Moreover, it is not clear if any, or at least how many, of the uses counted against the loan were uses of Raishevich's cannabis transparencies. Most of the work Raishevich did for High Times to pay off the loan appears to have been for advertisements that did not reproduce images from his collection of cannabis transparencies. Other work incorporating cannabis images may have been counted

against the loan (*i.e.,* one centerfold and images on High Times' Web page), but there is little concrete evidence of such uses or of the amounts credited against the loan on account thereof. Thus, the Court has no means to determine how much of the $5000 loan was earned by Raishevich through High Times' use of his cannabis transparencies.

Raishevich and Holmstrom also testified that High Times allowed Raishevich to contribute work to pay for a political advertisement, valued at $5000, on the back cover of the January 1991 issue. This transaction was the source of much confusion at trial; neither Raishevich nor Holmstrom could clearly explain the terms of this deal or how much work Raishevich contributed toward the ad. They testified, and a January 1991 art contract suggests, that one-third of the cost of the ad was paid for by reproduction of a Raishevich cannabis image as a centerfold in the May 1991 issue. However, the Court was provided with no evidence that Raishevich's work was in fact used in such a manner. In any event, the Court is not convinced that High Times would have credited Raishevich $1667 for a one-time use of a cannabis image.

The sparseness of Raishevich's proof of income from use of the transparencies is largely the product of the shocking state of record keeping by Raishevich and High Times. Holmstrom could provide no High Times accounting records reflecting payments to Raishevich. Moreover, although Raishevich testified that about 10% of his income was derived from freelance photography, he failed to report any of this claimed income in his tax returns. He also failed to demonstrate how much of this freelance income was derived from use of his cannabis transparencies.

In sum, Raishevich failed to prove that he derived any substantial amount of income from the use of his cannabis transparencies.

### B.  *Expertise and Reputation*

Predictably, each side's expert came to strikingly different conclusions as to the quality of Raishevich's work. On balance, the Court concludes that Raishevich was a reasonably skilled photographer whose best work is publishable at least in specialty media such as High Times.

### C.  *Plaintiff's Exploitation of Market Demand*

Raishevich demonstrated that the market demand for cannabis photographs is not insubstantial, although limited. He took pains to demonstrate that such photographs may be used, for example, in magazines of general interest, textbooks, encyclopedias, and drug treatment brochures, and on clothing, merchandise, and the Internet. Importantly, however, Raishevich proffered no credible evidence that he ever attempted or intended to exploit such uses.

### D.  *Competition and Alternative Sources*

Even a specialized magazine like High Times never relied heavily on Raishevich for cannabis photographs. Another photographer, Andre Grossmann, has done most of the magazine's covers and centerfolds and has received, in Holmstrom's words, "the lion's share" of its freelance photography budget. Grossmann also supplied the cannabis photograph that was used on the cover of one issue of The New York Times Magazine. Raishevich has not demonstrated that his photographic skills or the quality of his transparency collection would have enabled him to capture a larger share of this market long dominated by Grossmann.

### IV.  *Determination of Market Value*

The Court must now weigh these factors to determine how much Raishevich should be compensated for the loss of his transparencies. This determination involves two basic questions. First, what is the market value of a one-time use of a Raishevich cannabis transparency? Second, for how many such uses could Raishevich be expected to have been paid? This latter question encompasses two sub-issues: the percentage of the 347 lost transparencies that were professionally publishable, and the number of those that might actually have been published.

The analysis of Raishevich's expert, Jane Kinne, blurs these distinct issues. Kinne testified to an "industry standard" of

$1500 as the measure of compensation for each lost transparency. This amount represents an estimate of how much income a professionally photographed image would generate over the life of its copyright, assuming that the image would be sold for use approximately five times during that period. The figure is most often used by photography stockhouses as a measure of liquidated damages in the event of loss or damage to any of its photographs selected by and delivered to potential licensees for possible use. Kinne, who was appropriately referred to by one court as a "professional witness,"[1] has testified in over 85 cases, about 50 of which dealt with loss or damage to photographs. In none of those cases has Kinne ever valued a professionally taken and edited photograph at less than the $1500 industry standard.

Despite Kinne's relentless effort to spread the gospel of the "industry standard" (which she helped develop), that cookie-cutter value is of little use in a case such as this. To begin with, the $1500 figure is merely an *ex ante* estimation often used as a contractual measure of liquidated damages. In such situations, it is a contractual compromise between the photographer/agency and the potential client as to the value of the photograph, which might turn out to be much greater or much less. But where, as here, no liquidated damages clause (indeed, no contract) exists and a specific figure must be placed on the value of lost transparencies, the so-called "industry standard" is of little probative value.[2]

Because the $1500 "industry standard" has no relevance to the facts of this or any other particular case, Kinne's method of valuation is fundamentally flawed. Here, Kinne's expert opinion is that Raishevich suffered between $261,000 and $522,000 in damages. The former figure represents Kinne's estimation of the value of the transparencies sold or

licensed separately: without having seen the missing transparencies, she arbitrarily and, she says, "severely" edited out half (or 174) of the 347 transparencies as being of no commercial value; she then multiplied that figure by $1500. The $522,000 figure represents the value of 174 transparencies if sold as a collection, which according to Kinne would double their value.

The problems with Kinne's assessment are basic. First, her editing out only 50% of the transparencies seems too lenient. By contrast, defendant's expert, Robert Dannin, testified that he would have edited out over 98% of the transparencies. That figure seems too high, since it was based on the percentage of Raishevich's collection that Dannin, as a former editorial director at international photo agencies, would select to place in an agency's photo library. His analysis ignores the fact that Raishevich did not sell or attempt to sell his transparencies to such an agency, which probably would have little use for more than about five cannabis images in its library, but rather licensed them directly to High Times, a magazine with a greater demand for such images (and perhaps with lower quality standards) than the clients of an international photo agency. A more appropriate measure of the number of potentially publishable transparencies in Raishevich's collection would involve an editing percentage somewhere between Kinne's 50% and Dannin's 98%.

A second flaw in Kinne's valuation method is that she failed to distinguish between the number of publishable transparencies in Raishevich's collection and the number of those publishable transparencies that could reasonably be expected to be published. Given Raishevich's commercial history—in all, he has had published only about ten cannabis images (for some of which he has proved no compensation), and had none published in the

---

1.  See *Morrin v. 140 West 57th St. Corp.*, Index No. 21648/90 (Sup.Ct., N.Y. County Nov. 5, 1993).

2.  See, e.g., *Gasperini*, 66 F.3d at 429 ("the testimony of Jane Kinne [with respect to a $1500 industry standard] . . . is of little utility"); *Ryan v. Aer Lingus*, 878 F.Supp. 461, 466–67 (S.D.N.Y. 1994) (rejecting Kinne's $1500 valuation); *Nierenberg*, 189 A.D.2d at 572, 592 N.Y.S.2d at 28 ("[t]his record, as well as case law, makes it

clear that no [$1500] standard exists" *per se*) (quoting *MacWeeney*, 176 A.D.2d at 218, 574 N.Y.S.2d at 341); *Morrin*, Index No. 21648/90, at 6 ("While a Court might sustain a liquidated damages agreement fixing a value of $1500 per print, negative, slide or transparency, . . . there is no such basis for adopting Ms. Kinne's conclusion in this case.").

two years preceding the confiscation of his transparencies—it is likely that only a small fraction of his publishable images would actually have been published. To compensate Raishevich for each publishable transparency would be to grant him a recovery windfall far beyond the income he likely would have derived had the transparencies not been destroyed. *See Gasperini,* 66 F.3d at 429 ("The object of tort damages is to do what can be done to make an injured party whole; it is not meant to be a winning lottery ticket.").

By *conflating publishability and actual* publication, Kinne severely overvalued the transparencies. Her own testimony reflects that she valued the one-time reproduction right for one of Raishevich's cannabis images at $150. By assessing the loss value of each transparency at $1500, Kinne must have assumed that each publishable transparency would have been published at least ten times over the life of its copyright. The evidence clearly does not support such an assumption.

Moreover, Kinne's upper-limit estimation of damages ($522,000), which is based on her testimony that the value of Raishevich's transparencies would double if sold collectively, is irrelevant in view of Raishevich's own testimony that he never considered selling his collection as a whole.

What, then, is the value of the lost transparencies? The first issue to be determined is the value of a one-time reproduction right to a Raishevich cannabis transparency. Considering all the evidence—including the Court's prior finding that the transparencies were not irreplaceable; evidence that Raishevich received two checks for $200 (one of which constituted compensation for at least two uses) and a check for $400 for High Times' use of his cannabis transparencies; and the testimony of Raishevich's own expert that a one-time reproduction of his cannabis images should be valued at $150—the Court finds that each actual use of one of Raishevich's publishable transparencies could be expected to produce $200 in income for him.

Another consideration is the percentage of the 347 destroyed transparencies that were of publishable quality. As noted above, the Court concludes that Kinne's 50% edit is too lenient, and Dannin's 98% edit is too stringent. However, in this case there is no need for the Court to determine the exact number of transparencies which were publishable in some medium, because the number that might actually have been published is surely lower.

It remains to be determined how many of the missing transparencies would have been sold for publication. There is no evidence that Raishevich's cannabis images were published anywhere other than in High Times, and he gave little indication of any effort to expand into other media. Raishevich provided scant evidence of his actual earnings from past publication in High Times. Even giving him the benefit of every doubt, the evidence demonstrates that no more than ten of his cannabis transparencies were ever actually published, and two of those uses were republications in "Best of High Times" issues of images previously published in regular issues, for which Raishevich apparently received no extra income. No more than four images were published during the four-year period between December 1989 (Raishevich's first publication) and November 1993, when the transparencies were seized. Indeed, Raishevich had no publications at all in the two years preceding the seizure. Thus his peak rate of compensated publications was about two per year.

Assuming that Raishevich would have maintained this peak pace of two publications per year for the next 30 years, the Court finds it likely that he would have derived income from approximately 60 uses of his cannabis images. At the aforesaid rate of $200 per use, Raishevich would be entitled to $12,000 in compensatory damages for income lost as a result of the destruction of the seized transparencies. However, because defendant's destruction of the transparencies may have hindered Raishevich's efforts in selling publication rights to his transparencies and his ability to prove his damages with greater specificity, *cf. Electro–Miniatures Corp. v. Wendon Co.,* 771 F.2d 23, 27 (2d Cir.1985), the Court finds that the damage award should be doubled to $24,000.

## CONCLUSION

Accordingly, the Court finds that Raishevich is entitled to receive $24,000 in compensatory damages for defendant's destruction of his transparencies. The parties will bear their own costs and attorneys' fees. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.