152 F.3d 83
 82 A.F.T.R.2d 98-5467, 98-2 USTC P 50,606
 NESTLE HOLDINGS, INC., On Behalf of Itself and Consolidated
Subsidiaries, And As Successor In Interest To
Nestle Enterprises, Inc. And
Consolidated Subsidiaries,
Petitioner-Appellant,
Cross-Appellee,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee,
Cross-Appellant.
 Docket Nos. 96-4158, 96-4192.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 12, 1997.
Decided July 31, 1998.
 
 Roger J. Jones, Mayer, Brown & Platt, Chicago, Illinois (Joel V. Williamson, Joseph R. Goeke, Thomas Kittle-Kamp, Mayer, Brown & Platt; Alexander Spitzer, Gary P. Kirschenbaum, Nestle Holdings, Inc., Stamford, Connecticut; James S. Eustice, Stephen D. Gardner, Ann-Elizabeth Purintun, Kronish, Lieb, Weiner & Hellman, New York City, of counsel), for Petitioner-Appellant, Cross-Appellee.
 Thomas J. Clark, Tax Division, Department of Justice, Washington, DC (Loretta C. Argrett, Assistant Attorney General, Richard Farber, of counsel), for Respondent-Appellee, Cross-Appellant.
 Before: WINTER, Chief Judge, FEINBERG, Circuit Judge, and BAER, District Judge.*
 WINTER, Chief Judge:
 
 
 1
 Nestle Holdings, Inc. ("Nestle") appeals from the Tax Court's determination of tax deficiencies. See Nestle Holdings, Inc. v. Commissioner, 70 T.C.M. (CCH) 682, 1995 WL 544886, 1995 Tax Ct. Memo LEXIS 439 (1995). Nestle is a first-tier subsidiary of Nestle S.A. ("NSA"). The Commissioner of Internal Revenue determined tax deficiencies concerning Nestle's sale to NSA of various intangible assets, including patents, trademarks, trade names, and technology. Nestle claimed that it had realized a capital loss on the sale. The Commissioner found that Nestle had overstated the fair market value and in turn the basis of its intangibles and determined that Nestle had, therefore, realized a substantial capital gain on the sale.
 
 
 2
 Nestle petitioned the Tax Court for review of the Commissioner's determination. However, the Tax Court largely adopted the Commissioner's valuations and concluded that Nestle had realized a capital gain. Nestle appeals. We agree that Nestle realized a capital gain but reject the Tax Court's relief-from-royalty method of determining the fair market value of Nestle's trademarks.
 
 BACKGROUND
 
 3
 This dispute arises from a tender offer by Nestle for the stock of Carnation Company. Nestle's initial plan was to finance its acquisition of Carnation with a capital contribution of $525 million from NSA and a $2.5 billion loan from outside sources. Ultimately, this plan was revised, and the acquisition was financed by commercial loans of $1.6 billion and related-party loans of $1.325 billion. NSA provided some of these related-party loans but made no capital contributions to Nestle. The tender offer succeeded and, in January 1985, Carnation became a consolidated subsidiary of Nestle. After the acquisition, Nestle made requisite interest and principal payments to the related parties and deducted the interest payments as expenses on its tax returns.
 
 
 4
 As a result of the acquisition, Nestle became the owner of Carnation's intangible assets. Because NSA's policy was for it to own all of the trademarks and trade names used by Nestle companies, Nestle[1] sold to NSA the intangibles acquired from Carnation, including trademarks, trade names, patents, and technology. Nestle and NSA agreed that the price of the intangibles would be their fair market value and that NSA would cancel a portion of Nestle's debt to it in exchange for the intangibles. To estimate the fair market value of the intangible assets, Nestle retained American Appraisal Associates. It appraised Carnation's trademarks and trade names at $315,000,000, its technology at $106,018,700, and its patents at $4,612,000, for an aggregate fair market value of $425,630,700. Accordingly, on April 30, 1985, NSA cancelled $425,630,700 of Nestle's debt in exchange for the intangibles.
 
 
 5
 On its 1985 tax return, Nestle declared that the sale of the intangibles had caused it to realize a capital loss of $10,206,300.[2] This loss was a consequence of certain tax-code elections. Specifically, Nestle elected, pursuant to Section 338 of the Internal Revenue Code and Section 1.338(b)-4T of the Treasury Regulations, Temp. Treas. Reg. § 1.338(b)-4T (1986), to treat its purchase of Carnation's stock as a purchase of Carnation's assets and to adjust its basis in the acquired assets to their fair market value. Pursuant to the same treasury regulation, it also elected to employ a "transitional" allocation of the acquisition's "residual" goodwill. In other words, Nestle allocated to the acquired assets' aggregate basis the residual amount of consideration it had paid to acquire Carnation over the fair market value of the intangible assets it had received. As a result, the basis of Nestle's intangibles was stepped up to $435,837,000, an amount in excess of the assets' fair market value. Consequently, Nestle claimed a capital loss on the subsequent sale to NSA. See 26 U.S.C. § 1001.
 
 
 6
 The Commissioner challenged this claimed capital loss. In particular, the Commissioner disputed Nestle's valuation of the acquired intangible assets. The Commissioner ultimately valued Carnation's trademarks and trade names at $150,300,000 and its technology at $21,204,000 but agreed to the valuation of Carnation's patents at $4,612,000. The Commissioner assigned Nestle's acquired intangibles an aggregate basis of $163,556,000.[3] The Commissioner then reasoned that because Nestle had received $425,630,700 for assets that had a basis of $163,556,000, it had realized a short term capital gain of $262,074,700 on the sale of these assets. Because Nestle had failed to report this gain, the Commissioner determined a deficiency.
 
 
 7
 Nestle petitioned the Tax Court for a redetermination of its deficiency. Nestle first argued that, as a matter of law, it had not realized a capital gain on the sale but rather had received a capital contribution from NSA. According to Nestle, when a related party pays more or less than fair market value for an asset, the excess or shortfall is attributable to the parties' relationship and should be reclassified accordingly. In this case, the relationship between the parties was that of shareholder-corporation, so the excess over fair market value NSA had paid to Nestle was, under this argument, a capital contribution. The Tax Court rejected this argument, holding that allowing the excess purchase price to be treated as a capital contribution would impermissibly "allow petitioner retroactively to convert debt into equity, without any adverse tax consequences." Nestle, 1995 WL 544886, 1995 Tax Ct. Memo LEXIS 439, at *188.
 
 
 8
 Nestle next argued that, even if there were a capital gain, the Commissioner had overestimated the tax deficiency by undervaluing the fair market value of the trademarks and trade names that Nestle had sold to NSA and thus understating their basis. Nestle introduced expert testimony that the fair market value of the trademarks and trade names was really $346,000,000. At this point, the Commissioner abandoned her earlier negative adjustment of the intangibles' basis, see Note 3, supra, and introduced evidence that the fair market value and basis of the trademarks and trade names was only $146,100,000.
 
 
 9
 The Tax Court first found that Nestle was not entitled to claim a second-tier step-up in basis. See id. 1995 WL 544886, 1996 Tax Ct. Memo LEXIS 439, at * 181 (adopting the residual-allocation method). Thus, Nestle could adjust the basis of the intangibles only to their fair market value. The Tax Court next discredited Nestle's valuation expert and his calculation of the fair market value of Nestle's intangibles, holding that some of his calculations were "not sufficiently grounded on facts in this record" and that one of his valuation methods--the econometric method--was not necessarily "appropriate." Id. 1995 WL 544886, 1995 Tax. Ct. Memo LEXIS 439, at *128-32 It instead found that the trademark valuation method used by the Commissioner's expert--the relief-from-royalty method--was reasonable and concluded that Nestle had not "demonstrated that the Carnation trademarks and trade names are worth more than the value determined by [the Commissioner's expert]." Id. 1995 WL 544886, 1995 Tax Ct. Memo LEXIS 439, at * 144. Accordingly, it found that the trademarks and trade names Nestle had sold to NSA had a value and basis of $146,100,000. Id. The court found as the bottom line that Nestle's aggregate basis in all the intangibles--including patents and technology--was $219,482,000 and that it had, therefore, realized a capital gain of $206,148,700 on the sale to NSA.
 
 
 10
 On appeal, Nestle does not dispute the Tax Court's finding that it was not entitled to claim a second-tier step-up in basis. All parties therefore agree that the basis in the intangibles should have been their fair market value. However, Nestle challenges two aspects of the Tax Court's opinion. First, it contends that the Tax Court failed to recognize that, as a matter of law, any excess over fair market value received on the sale of the intangibles was a capital contribution by NSA, not a capital gain by Nestle. Second, it contests the fair market value, and thus the basis, assigned by the Tax Court to the intangibles. The Commissioner cross-appeals from the Tax Court's characterization of NSA's loan to Nestle as bona fide, an issue that arises only in the event we hold that the cancellation of this debt was a capital contribution.
 
 DISCUSSION
 
 11
 We review de novo questions of law concerning the tax consequences of Nestle's sale to NSA. See Follum v. Commissioner, 128 F.3d 118, 119 (2d Cir.1997) (per curiam). However, factual determinations, such as the values assigned to assets, are reviewed only for clear error. See id. * 87
 
 A. Tax Consequences of the Nestle-NSA Sale
 
 12
 Nestle claims that the excess of price over fair market value paid by NSA for the intangibles should be treated as a capital contribution. However, such treatment would constitute a retroactive change in the form of the transaction with NSA. When it initially structured this transaction, Nestle believed that it would be able to step up the basis of the intangibles to an amount in excess of their fair market value, and then claim a capital loss on the sale to NSA. Now that the second-tier step-up has been denied--a decision that Nestle does not challenge on appeal--and it faces a capital gain, Nestle seeks to recharacterize a portion of its transaction with NSA as a capital contribution.
 
 
 13
 Such a recharacterization is contrary to the rule that "a taxpayer is free to organize his affairs as he chooses, [but] once having done so, ... he must accept the tax consequences of his choice, whether contemplated or not." Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974) (citing Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940)); see also Consolidated Edison Co. v. United States, 10 F.3d 68, 72 (2d Cir.1993) ("[W]hen 'knowledgeable parties cast their transaction voluntarily into a certain formal structure, ... they should be and are, bound by the tax consequences of the particular type of transaction which they created.' ") (quoting Federal Bulk Carriers, Inc. v. Commissioner, 558 F.2d 128, 130 (2d Cir.1977)); Estate of Durkin v. Commissioner, 99 T.C. 561, 574-75, 1992 WL 335900 (1992). The Commissioner, on the other hand, is not required "to acquiesce in the taxpayer's election of that form" but may challenge the chosen form as a sham. Higgins, 308 U.S. at 477, 60 S.Ct. 355; see also Newman v. Commissioner, 902 F.2d 159, 162-63 (2d Cir.1990).
 
 
 14
 The chosen form of the transaction between Nestle and NSA was a sale of assets. The Tax Court found that this choice of form was not a sham, and the Commissioner does not argue otherwise. Accordingly, because the NSA transaction was structured as a sale, any gain realized by Nestle must be treated as a capital gain. See I.R.C. §§ 1001, 1221-22.[4]
 
 
 15
 We therefore affirm the Tax Court's characterization of any gain that Nestle may have realized on the sale of its intangibles to NSA as a capital gain. In view of this disposition, we need not consider the cross-appeal and dismiss it as moot.
 
 B. Valuation of Nestle's Intangibles
 
 16
 The Tax Court found that Nestle's evidence concerning the fair market value of its trademarks was flawed and adopted the valuation proffered by the Commissioner's expert. The expert estimated the fair market value of Nestle's acquired trademarks using the relief-from-royalty valuation method. Underlying this methodology is the view that the only value a purchaser of a mark receives is relief from paying a royalty for its use. Using this model, the fair market value of a trademark is derived by calculating the net present value of the stream of royalty payments from which the purchaser of a mark is * 88. relieved. This stream is calculated by (i) determining if the trademarks are profitable, or capable of being licensed, (ii) picking a royalty rate for each trademark, and (iii) multiplying this rate by the estimated revenue stream of the product associated with the mark. The Commissioner's expert concluded that most of the marks were profitable and that the range of royalties in the food industry was zero to five percent. He then assigned royalty rates to the trademarks and calculated the net present value of the estimated royalty payments. The Tax Court found this methodology reasonable and adopted the expert's conclusion. We disagree.
 
 
 17
 In our view, the relief-from-royalty method necessarily undervalues trademarks. The fair market value of a trademark is the price a willing purchaser would have paid a willing seller to buy the mark. See American Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc., 912 F.2d 563, 569 (2d Cir.1990); accord United States v. Cartwright, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973) ("The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves."). The relief-from-royalty model does not accurately estimate the value to a purchaser of a trademark.
 
 
 18
 Royalty models are generally employed to estimate an infringer's profit from its misuse of a patent or trademark. See generally 35 U.S.C. § 284; Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1157-58 (6th Cir.1978). Resort to a royalty model may seem appropriate in such cases because it estimates fairly the cost of using a trademark. But cf. Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340, 1351-52 (7th Cir.1994) (noting that this model can under-compensate even the victims of infringement).
 
 
 19
 However, use of a royalty model in the case of a sale is not appropriate because it is the fair market value of a trademark, not the cost of its use, that is at issue. A relief-from-royalty model fails to capture the value of all of the rights of ownership, such as the power to determine when and where a mark may be used, or moving a mark into or out of product lines. It does not even capture the economic benefit in excess of royalty payments that a licensee generally derives from using a mark. Ownership of a mark is more valuable than a license because ownership carries with it the power and incentive both to put the mark to its most valued use and to increase its value. A licensee cannot put the mark to uses beyond the temporal or other limitations of a license and has no reason to take steps to increase the value of a mark where the increased value will be realized by the owner. The Commissioner's view, therefore, fundamentally misunderstands the nature of trademarks and the reasons why the law provides for exclusive rights of ownership in a mark. Given the shortcomings of the relief-from-royalty methodology, the Tax Court erred when it adopted the Commissioner's trademark valuations. The Tax Court is instructed to examine alternate methods of determining the fair market value of the trademarks in question.
 
 
 20
 For these reasons, we vacate the Tax Court's valuation of Nestle's trademarks and remand for proceedings consistent with this opinion. We dismiss the cross-appeal as moot.
 
 
 
 *
 The Honorable Harold Baer, Jr., of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 The term "Nestle" is used hereafter to refer to Nestle Holdings, Inc. and its consolidated subsidiaries, including Carnation
 
 
 [2]
 Nestle deferred this loss pursuant to Section 267 of the Internal Revenue Code
 
 
 [3]
 This aggregate basis was lower than the aggregate fair market value of the assets due to a "negative basis adjustment" that was ultimately repudiated by the Commissioner
 
 
 [4]
 Nestle asks us to infer from the rule that a constructive dividend is imposed on an owner of a corporation whenever it purchases a corporate asset for less than its fair market value, see Treas. Reg. § 1.301-1(j), the converse rule that a corporate owner makes a capital contribution whenever it purchases a corporate asset for more than its fair market value. This inference, Nestle argues, is consistent with the symmetrical tax treatment of non-fair-market-value sales of corporate assets to shareholders. In support of this inference, Nestle relies on a number of cases and a proposed treasury regulation. See, e.g., Prop. Treas. Reg. § 1.1012-2, 51 Fed.Reg. 12022, 12046 (1986); Investors Diversified Servs., Inc. v. Commissioner, 39 T.C. 294, 1962 WL 1378 (1962), aff'd, 325 F.2d 341 (8th Cir.1963); Majestic Securities Corp. v. Commissioner, 42 B.T.A. 698 (1940), aff'd, 120 F.2d 12 (8th Cir.1941); Pennsylvania Indem. Co. v. Commissioner, 30 B.T.A. 413 (1934), aff'd, 77 F.2d 92 (3d Cir.1935)
 In effect, Nestle is arguing that an exception should be carved into the general rule that a taxpayer is bound by the chosen form of its transaction when such taxpayer is a corporation selling property to a shareholder at a price that exceeds the property's fair market value. Under the circumstances of this case, we decline to create such an exception to the long-standing rule established in National Alfalfa, 417 U.S. at 149, 94 S.Ct. 2129.