Arthur GRACE, Plaintiff,

v.

CORBIS SYGMA f/k/a Sygma Photo News, Inc., Sygma S.A.R.L., f/k/a Sygma Paris, Corbis Corporation, Defendants.

No. 02 Civ. 8597(DC).

United States District Court, S.D. New York.

Dec. 9, 2005.

Greenberg & Reicher, LLP, by Edward Greenberg, Esq., Erica Galinski, Esq., New York, NY, for Plaintiff.

Dorsey & Whitney LLP, by Douglas C. Fairhurst, Esq., Jeffrey L. Loop, Esq., New York, NY, for Defendants.

## OPINION

CHIN, District Judge.

  

Plaintiff Arthur Grace is a photojournalist whose photographs recorded events of historical significance for many years. His images appeared in numerous newspapers and magazines, including *Time, Newsweek,* and *Life,* often on the cover, examples of which are shown above. For three decades he had a licensing arrangement with defendant Sygma Photo News, Inc. ("Sygma"), whereby Sygma took possession of the images and licensed them to news publications and other media. When the relationship ended in 2001, Grace asked Sygma to return his photographs, but many—indeed, tens of thousands—were missing. Grace brought this diversity action to recover damages for the missing images.

The case was tried to the Court in November and December 2004. Judgment will be entered in favor of Grace, to the extent set forth below. The following constitute my findings of fact and conclusions of law.

### FINDINGS OF FACT

#### A. *The Career of a Photojournalist*

Grace began his career as a photojournalist as a "stringer," or freelance photographer, for United Press International ("UPI") in Boston in the early 1970s. He eventually was hired as a staff photographer for UPI in Europe and was assigned to cover, among other things, the hostilities in Northern Ireland; the drought in Western Africa; and the 1973 Middle East war. His photographs were published in newspapers and magazines throughout the world. (Tr. 53–56, 247; PX 10).[1]

In 1974, Grace returned to Boston and became the New England photo correspondent for *The New York Times,* working as an independent contractor. He shot photographs for the national page of the *Times.* He remained with the *Times* through 1977. His major stories included school busing and desegregation in Boston in 1974 and 1975. During this period, he did not work for other newspapers, but he was able to and did shoot photographs for magazines, including *Time* and *People.* (Tr. 56–60, 455; PX 10).

In 1978, after leaving the *Times,* Grace moved to Washington, D.C., and began shooting full-time, eventually under contract, for *Time* magazine. (Tr. 60–61, 92–94, 247–48, 458–59; PX 10). From 1978 through 1980, Grace served as *Time* magazine's White House photo correspondent. He covered the White House extensively during the Carter Administration and often traveled with President Carter. Dur-

1. References to "Tr." are to the trial transcript. References to "PX" and "DX" are to plaintiff's exhibits and defendants' exhibits, respectively, received at trial.

ing the Iran hostage crisis in 1979, he was given the opportunity to photograph President Carter alone one evening in the Oval Office, without any other photographers present. The image of President Carter in a sweater sitting at his desk and studying an Iran briefing book appeared in many magazines, including on some covers. (Tr. 92–99; PX 13).

Grace continued as a contract photographer for *Time* until 1985, and he photographed, among other stories: the 1980 presidential campaign; President Carter's efforts to bring peace to the Middle East; the Solidarity movement and martial law in Poland in the early 1980s; the U.S. invasion of Grenada in 1983; Geraldine Ferraro's vice-presidential campaign in 1984; the America's Cup loss in Newport, R.I. in 1983; and the 1984 Los Angeles Olympics. (Tr. 80–81; PX 10).[2]

In January 1986, Grace joined *Newsweek* as a staff photographer, on salary. Grace remained with *Newsweek* through 1990, covering, among other stories: the Bork Supreme Court nomination; the Challenger space shuttle disaster in 1986; Pope John Paul II's visit to Poland in 1987; the Reagan–Gorbachev summit in Moscow in 1988; and President George H.W. Bush's visit to Europe in 1989. He also published several photographic essays in *Newsweek*, including street kids in San Francisco; life in Poland; and portraits of presidential candidates in 1987 and 1988. The latter was later expanded into a book, *Choose Me: Portraits of a Presidential Race*, which was · published in 1989. He also photographed the Supreme Court justices. (Tr. 134–37, 147, 250, 372–73, 381, 487–88; PX 10, 38).

Starting in the 1990s, Grace's career took a different turn. He continued his professional photography but shifted away from news photography. He wrote and photographed a coffee table book, *Comedians*, published in 1991. He struck a relationship with Robin Williams and began shooting album covers, movie posters, and personal and family functions for the actor-comedian. Grace and his assistant were the first photographers to take photos of the actor Christopher Reeve after the accident that left him paralyzed. Reeve was a friend of Williams, and Williams and his wife organized a fundraiser and asked Grace to volunteer his photographic services. Grace did so. (Tr. 151–53, 646–48).[3] Grace also did freelance work for advertising clients, including major movie studios. He also did personal work for other celebrities; for example, he photographed Steven Spielberg's wedding. (Tr. 147–52, 244–45, 293–97, 430; PX 10).

During the 1970s and through the 1980s, Grace was one of the leading photographers in the field of photojournalism. (Tr. 432–41, 452, 455–56, 581, 970–72; *see also* Tr. 109). He captured many moments of historical significance with his "unique eye," and his photographs had a certain quality to them that photographs of other

**2.** In the 1984 Olympics in Los Angeles, Grace took several photographs of the American runner Mary Decker falling and in despair after she tripped when she and barefoot 18–year old Zola Budd became entangled. The photographs were widely circulated. (*See* Tr. 353, 362). The Decker images can be viewed on-line at: http://www.zumapresswireservice.com/ search—results.html?SRCH= arthur+grace+mary+decker & FILESrchType=is & FILE= & person= & selCollections = & timerange= & disptype= & srchtype= & RESULTSPERPAGE=24 & photographer= & SBMT.x=0 & SBMT.y=0 (last visited December 1, 2005).

**3.** Grace's relationship with Williams ended in 2003 when he sold most of his photographs of Williams and his family to the Williams family. He no longer takes photographs for Williams or his family. (Tr. 309–13).

photojournalists did not have. (*See* Tr. 468, 486, 488). One of his photographs in *The New York Times* was nominated for a Pulitzer prize. (Tr. 432; PX 42A). In 2003, Grace agreed to donate all his color images and many of his black and white images to the Center for American History (the "Center") at the University of Texas. The images will be referred to as The Arthur Grace Photographic Collection and the Center will house, preserve, and maintain the collection for educational and scholarly purposes. (Tr. 409–12, 423–25; DX N).

## B. *Grace Signs with Sygma*

Sygma began its operations as a photo agency in the early 1970s, when it broke off from a company called Gamma. (Tr. 573–75). Sygma had an office in New York but its main office was in France. (Tr. 575). Eliane Laffont was part of the group that left Gamma to start Sygma; she was involved in the operations in New York. (Tr. 573, 583–86, 645–46).

In the early 1970s, Grace met with Laffont in Manhattan. (*See* Tr. 57–58, 61–64, 215, 575, 645). They agreed to work together: Grace agreed to turn his photographs over to Sygma, and Sygma agreed to act as Grace's agent to license the images. Grace would "receive 50 per cent of whatever [Sygma] made,"[4] and Sygma would be responsible for getting the images to clients, negotiating the fees with clients, getting the images back from clients, and billing for and collecting the

fees. (Tr. 62–63, 215–19, 224–25). The agreement was not put into writing, nor was there any discussion about how long the agreement would last or how the agreement could be terminated. (Tr. 63–65, 220).

Grace had a follow-up conversation with Laffont in approximately February or March of 1974, after he returned from his stint in Europe, when he firmed up his relationship with Sygma and discussed the arrangement in more detail. Laffont explained that there would be a monthly statement with a check for Grace's share of the income. She also represented that she would work to promote Grace and get him assignments. (Tr. 229–33). Again, there was no written contract or other memorialization of the discussion. (Tr. 236). Grace never had any discussion with Laffont about how his materials would be returned to him if and when the relationship ended. (Tr. 361).

## D. *Sygma Licenses the Images*

After Grace signed with Sygma, when he shot on assignment for *Time, Newsweek,* or other magazines, the magazine in question eventually released the images to Sygma to distribute and license worldwide. (Tr. 66–69). Sometimes Sygma itself sent Grace out on assignment, and the images he took on these assignments were also made available by Sygma for licensing. (Tr. 74, 116, 226, 280, 589). When images were published, they usually were accompanied by a credit line that read "Arthur

---

4. At trial Grace's attorney acknowledged that, although Grace did dispute certain deductions, he agreed that the understanding was that he would receive 50 per cent of what Sygma New York received in fees. (Tr. 10). In the late 1980s, Grace heard from certain photographer friends that the photo agencies were withholding more than 50 per cent. He spoke with Laffont and she explained, in essence, that where "subagents" were involved, Grace's 50 per cent was of the net sales, that is, 50 per cent of what remained after the subagent took a commission first. This applied even to Sygma–Paris, so that if Sygma–Paris placed a photo, it would get its commission first and then Sygma and Grace would split what was left 50–50. Grace accepted this, albeit unhappily, as the way the industry worked. (Tr. 332–39).

Grace/Sygma," although in later years for photos taken for *Time* the credit simply read "Arthur Grace." (*See* Tr. 69–70, 140–41).[5]

During this period, which preceded the introduction of digital photography, Grace usually shot in 35 millimeter format, both black and white and in color. (Tr. 70–71, 582–83).[6] For black and white photos, Sygma would usually make prints from the negatives and then send a selection to clients. For color shots, Sygma would send either originals or duplicates of the slides to the clients. (Tr. 582–83).

Grace shot on location, using rolls of film with 36 exposures. (Tr. 71–73). After a shoot, Grace would send the film back to the entity that had assigned him—*Time*, *Newsweek*, other magazines, or Sygma—for processing. (Tr. 67, 74).[7] Once he sent film, like most photojournalists, he would want to confirm as quickly as possible whether the film had been received and processed and he anxiously awaited hearing whether the shots "came out well." (Tr. 81–82). Grace did not keep a record of the rolls of film he submitted. He did use caption envelopes, both at *Time* and

*Newsweek*, on which he wrote down certain information and any necessary instructions, but he did not make copies of these. (72, 74–78, 90–91, 138; PX 6).

At *Time*, once the film was developed, the editors would go through an editing or selection process to find the image or images that would best fit the story. A small selection of images would be shown to the editor in charge. (Tr. 82–83, 454, 456; *see* Tr. 221).[8] After the magazine made its selections, in general the negatives (for black and white) or slides (for color) would be released to Sygma. Often *Time* made duplicates of images. A representative of Sygma—in the early days, often Laffont herself—would go to *Time's* offices to pick up the materials. (Tr. 83–85, 456, 458, 586). As soon as the magazine "closed" on Friday nights, all the photo agencies, including Sygma, would appear at the Time–Life building to pick up the film for their photographers so that they could begin the process of distributing the images as quickly as they could. *Time* had the right of first usage, but Sygma could then offer the images for use by other publications, including those distributed in Europe. This process continued at least through

5. Grace also had a relationship with another photo agency, Stock Boston, that placed photographs in textbooks and other books. This relationship existed for some 15 years. Stock Boston was not a competitor of Sygma. Over the years approximately 100 images were given to Stock Boston rather than to Sygma. (Tr. 376–78, 382–83).

6. One exception was Grace's book, *Choose Me: Portraits of a Presidential Race*. The images were shot using a twin lens 2 1/4 Rolleiflex loaded with medium-format 120 film, using only black and white film and existing light. (PX 38 at 126).

7. For most of these news stories, other photographers were present as well, including photographers from other publications, the major wire services, and photo agencies. (Tr. 283, 285–87, 384). Many of these other pho-

tographers were also superior photographers, and Grace was competing with them. (Tr. 467, 749–50, 796). In the late 1980s, Sygma itself was working with 30 to 35 photographers. (Tr. 595). Likewise, Sygma had competition, as the magazines were working with six to ten different photo agencies in the 1970s and 1980s. (Tr. 492).

8. The shots that were not selected were referred to as "out-takes." (Tr. 222). When Grace struck his deal with Laffont, there was no discussion as to what would happen with "out-takes." (Tr. 223). In general, when a photographer shot a story, he or she would often shoot several rolls, but only a handful of images would actually be published. (Tr. 472–73, 751, 801–02). A newspaper would typically run one or two images for a story, while a magazine might run three or four photos for a story. (Tr. 752).

1985, when Grace left *Time.* (Tr. 67–68, 85, 89–90, 469, 589–90).

The process was essentially the same at *Newsweek.* (Tr. 137, 589, 594; *see* Tr. 488–89). After Grace shot a story, he would send the rolls of film to *Newsweek,* and the film was usually processed at *Newsweek's* headquarters in New York. (Tr. 138). Sygma picked up Grace's film, once it was released, in the same manner as it did at *Time,* also on Friday nights at first and later on Saturday nights when *Newsweek* moved its deadline to Saturday. (Tr. 139–40). Even though Grace was an employee of *Newsweek,* the practice was to release the images to Sygma once the magazine closed so that Sygma could try to license them to other publications. (Tr. 141–42). This continued to be the practice until Grace left *Newsweek.* (Tr. 142–43, 146).

When Sygma sent photographs to a client, it used a standard consignment form that specified that $1,500 would be charged for any lost or damaged transparency. (Tr. 462–63, 493, 583, 621–23; PX 43, 44). The amount of $1,500 as a liquidated sum for a lost transparency was industry standard in the 1970s. (Tr. 463, 490, 629). When an image was lost, however, often the amount to be paid was negotiated or the fee was waived. (Tr. 541–43, 799–800).

**E. Sygma's System for Storing the Images**

Sygma never had a system in New York for keeping track of all the images in its inventory. Its system for tracking images was "completely inadequate." (Tr. 814). Materials were not organized by photographer, but were kept chronologically and by theme or story. When slides were sent out on consignment, no record was kept of which images were sent to the client or which images were returned. Speed was essential, and the pace of the business made it difficult to keep accurate track of the images in the pre-digital age. As late as January 2, 1998, Sygma was unable to account for all its images in New York. In Paris, Sygma started to keep track of its photographs starting in 1977, but this system was also inadequate. (Tr. 630–32, 814–15, 906).

In June 1999, Corbis Corporation ("Corbis") acquired Sygma and Sygma–Paris. Sygma became known as Corbis Sygma and Sygma–Paris became known as Sygma S.A.R.L. (*See* Def. Pretrial Prop. Findings of Fact & Concl. of Law at 3; Tr. 631; PX 28). By acquiring Sygma, Corbis acquired Sygma's right to license some 40 million images (including Grace's images).[9]

No inventory had been prepared of all the photographs in Sygma's archives. (Tr. 814–15, 905–07). Since the acquisition, the Sygma images have been stored, together with other images, in double-stacked file cabinets that fill three rooms the size of a courtroom. Approximately 60 per cent of the images are Sygma images. (Tr. 907–08).

Over the course of the years, on occasion, perhaps once a year, Grace asked

---

**9.** Corbis paid approximately $12.5 million for the licensing rights to the 40 million images. Corbis selected some 700,000 of the images for digitization. (Tr. 690–92, 708–11, 715). In 1995, Corbis acquired the copyrights to the Bettmann collection of 11 million images, for $13.5 million. Of the 11 million images, some 250,000 were selected for digitizing, cataloging, and placement into the licensing stream. (Tr. 674–75, 679, 684, 685–86, 690–91; *see also* Tr. 931–32). In 1996 Corbis acquired the copyrights to the Turnley collection of 600,000 images, for $2.3 million. This collection had already been edited, and after the acquisition, 70,000 to 80,000 of the images were selected for digitizing and licensing. (Tr. 675–76, 679, 687–88, 690–91; PX 41). Both these collections were historically significant. (Tr. 675–76, 683–84).

Sygma for the return of specific photographs, for example, when he wanted to enter a photograph in a contest. He never had difficulty on any of these occasions getting an image back. (Tr. 123–24, 158–60, 361–62).

### F. *Grace's Licensing Income*

Over the years, Grace received monthly statements from Sygma, one for New York and one for Paris, showing his share of the licensing fees. He also received a check each month for his royalties (covering both New York and Paris). (Tr. 237–38, 329, 340, 342). The record contains the monthly statements for New York from 1988 through 2002 (DX A) and for Paris from 1979 through 2002 (DX B).[10]

For the thirteen years from 1990 to 2002, from Sygma's licensing of his images, including both international and United States "sales," Grace earned $143,032.29 (after deductions), or an average of $11,002.48 per year.[11] These numbers include fees from the licensing of images of Robin Williams and Christopher Reeve. When those fees are removed, Grace's average total income for the ten-year period from 1991 through 2000 was $5,881. (DX CC at 4; *see* DX R–3; Tr. 875–79).

Although the data is incomplete (particularly for New York), Grace's earnings from 1979 through 1989 appear somewhat higher than they were in the 1990s. Grace's best year was 1979, when his Paris licensings earned 80,232.36 francs, or $19,970.72.[12] For that eleven-year period,

10. There was some uncertainty at trial as to whether the Paris statements were in dollars or francs. (*See* Tr. 345–48). I conclude they were in francs. Starting in 1994, the statements were in both francs and dollars. (*See* DX B). Moreover, a number is written on some of the earlier sheets showing the equivalent in U.S. dollars. (*See, e.g.,* DX B at CS 00749 (8/31/83), CS 2202 (4/30/88)). At trial defendants offered, and the Court received, charts summarizing Grace's licensing income from 1990 through 2002. DX T–1 shows all Grace's stories and the income from the international licensing of his images by Sygma for each year from 1990 through 2002, by story. DX T–2 is a summary of the international income by year, from 1990 through 2002. (Tr. 833–39, 855–56). DX T–2 gives the numbers in Euros, and the Court has converted the numbers to dollars using the published exchange rates as of the last day of each year, with the December 31, 1997 rate ($1.098) used for the years from 1990 through 1997. (*See* http://www.x-rates.com/cgi-bin/hlookup.cgi (last visited Dec. 6, 2005); DX CC at 3, 9). DX R–1 and DX R–2 are similar to T–1 and T–2 except that they show the income stream for U.S. sales and the numbers are given in dollars. (Tr. 871–74).

11. These calculations are based on DX B, DX T–2, and DX R–2, except that I have made adjustments because DX T–2 contains a significant error. It shows no income to Grace for

1990, but the royalty statements themselves show that in 1990 Grace earned 67,579.33 francs. (*See* DX B at Tab 1989–1990). Hence, the total for DX T–2 is incorrect, understated substantially. I have converted the francs to dollars using an exchange rate of 5.1000 francs per dollar (the rate as of December 31, 1990) (*see* http://www.federalreserve.gov/ releases/H10/hist/dat96—fr.htm) (last visited Dec. 9, 2005), which results in $13,250.85. The numbers in Euros on DX T–2 were also converted to dollars. The revised total is $96,239.72. That amount plus the total of $46,792.57 from DX R–2 totals $143,032.29, which, when divided by thirteen, gives an average of $11,002.48 per year.

12. Neither side offered any summaries at trial for the earlier years. In his post-trial submission, Grace submitted a chart summarizing the income, based on the monthly sales reports. (Pl. Post–Trial Br., Ex. 2; *see also* DX A, B). This chart is not part of the trial record, and is inaccurate because it gives the income for Paris as dollars when the numbers are actually francs. Hence, the chart is significantly overstated. The totals can be calculated by adding the numbers in the pre–1994 statements in DX A and B and converting from francs to dollars. For 1979, I calculate 80,232.36 francs, while Grace's chart shows $80,357.34. Using the conversion rate of 4.0175 francs per dollar for December 31,

Grace averaged $8,475.77.[13] If New York income were to be added, Grace's annual earnings from Sygma's licensing of his images would exceed the average for the period from 1990 through 2002.

Assuming Grace were to earn $5,900 per year from the licensing of his images for the next thirty years, the present value of that sum would be approximately $48,000, using a discount rate of 12 per cent. (DX CC at 4–5; Tr. 1028, 1048–49). This calculation does not account for the likelihood that the income stream would decrease over time as the images continue to age. (Tr. 1030).[14] Moreover, the calculation is based on all Grace's images, and no deduction has been made to account for the many images returned to Grace, which are available for him to license. (Tr. 1031). On the other hand, the drop in Grace's income stream from the 1980s to the 1990s undoubtedly was due in part to the loss of so many of his images—they were not available for licensing because they were missing.

## G. Grace Ends His Relationship with Sygma

In May 2001, Grace decided to end his relationship with Sygma, or, as it was known by then, Corbis Sygma. He did so for three reasons. First, the people he had worked with at Sygma over the years had left, following Sygma's acquisition by Corbis in June 1999. Second, he believed he was earning less money from his photographs, even though the same number of photographs were being licensed. Third, he had read, and other photographers had told him that they had also heard, that Corbis had purchased a cave in Pennsylvania that was going to be used to archive photographs that Corbis had been acquiring. This concerned the photographers, who feared their images would not be accessible. (Tr. 154–56, 321–22, 326–28; see Tr. 707).

On May 10, 2001, Grace sent a letter to Charles Borst, the Executive Editor of Corbis Sygma, that read in part:

> This letter is formal notification that I am terminating Corbis/Sygma's representation of my photography effective immediately.

1979, 80,232.36 francs is equal to $19,970.72. (See http://www.federalreserve.gov/releases/H10/Hist/dat89—fr.htm) (last visited Dec. 9, 2005). For 1983, the Paris statements total 53,241.31—the same number Grace has in his chart. But he has it as dollars whereas the numbers are francs. Using the rate for December 31, 1983 of 8.3350 francs per dollar, equivalent is $6,387.68.

13. I obtained this number by taking Grace's chart (Pl. Post–Trial Br., Ex. 2), using all the Paris numbers except that I used 80,232.36 for 1979. I converted from francs to dollars for each year using the exchange rate at the end of each year. The total was $93,233.49, for an average of $8,475.77 per year.

14. Photographs of a news event are likely to have greater monetary value immediately following the event. After a news event begins to fade into history, there usually will be a decrease in demand for photographs of the event and the value of the images therefore usually will decline in time. Images of famous individuals taken at a particular time will also decline in value as time moves on, particularly as more current photographs become available. (Tr. 741–42, 750–51, 917–18). Sometimes a current news story will renew interest in a person or a historical event, and, in these instances, an older image will take on some additional value, at least temporarily. For example, when President Reagan died last year, there was a renewed demand for photographs of him. (Tr. 743, 763–64, 918–19). Likewise, for example, when the movie Seabiscuit was released several years ago, that sparked a renewed interest in the story and there was a temporary increased demand for photographs of the racehorse Seabiscuit. (Tr. 915–16).

Please alert all of your agents and sub-agents around the world to cease selling my material as of today's date and to return all of my material in their possession to me via Corbis/Sygma.

I expect all of my images that are now in Corbis/Sygma's files to be returned to me no later than June 1, 2001. This includes all images from May 1972 to the present that have been archived in both New York and Paris as originals or dupes.

(PX 7; see Tr. 769–70).

After leaving Corbis Sygma, Grace signed with another photo agency, Zuma, one of Corbis's competitors. (Tr. 207–08). Zuma is serving the same function for Grace that Sygma served over the years. Grace's photos are historically significant, and because Zuma had a gap in its archives for the 1970s and 1980s, Zuma was interested in Grace's images. (Tr. 207–08).[15]

## H. *The Return of the Images*

After he sent his May 10, 2001, letter, Grace had several conversations with Borst about the return of his materials, and Borst also left several messages for Grace on his answering machine. These conversations began and the messages were left starting in June 2001 and continued through September 2001. Corbis Sygma was having difficulty gathering and returning Grace's photographs. It was encountering problems finding and "pulling" the images, and there were other photographers who had also terminated their relationships with Corbis Sygma who had asked for the return of their photographs as well. For Grace, some thirty years'

worth of photographs were involved, and the photographs were kept in different locations. (Tr. 163–69, 364–65, 768–69, 828–29; PX 5A) (transcript of telephone messages).

At some point, Corbis obtained a list of the stories for which Grace had received licensing fees and went through its files for each of those stories looking for Grace's images. Some were found and returned to him. (*See* Tr. 169, 992–97, 1005).

The first images were returned to Grace in the fall of 2001. (Tr. 169). The process has continued, as there were periodic returns after the filing of this lawsuit. (Tr. 119). Some images were not returned until the week before trial. (Tr. 99). Many of the images were returned in a disorganized and haphazard fashion. For example, at one point after suit was filed, Grace received two boxes containing more than a thousand rolls of processed black and white film covering stories from 1972 through 1984. There was no caption sheet or memorandum identifying the images. Grace and his assistants had to cut the rolls into strips and organize them, a difficult and laborious process. (Tr. 119–23). Some of the returned slides had mold (or some other contaminant) on them. (Tr. 201–04). In addition, in the midst of the trial, in response to a subpoena, *Time* returned some 2,000 of Grace's images that it had retained. (Tr. 507–08).

As of December 7, 2004, Sygma had returned 33,013 original images to Grace. (PX 2A (33,013); *see* DX K (noting return of 34,792 images, including duplicates, as of September 14, 2004)). Based on Grace's estimates, tens of thousands more are still

---

15. Like many other photo agencies, Zuma has shifted to a digital system of storing, licensing, and distributing images. Zuma has scanned Grace's images and made them available digitally through the Internet. (Tr. 324–25). Zuma is reviewing Grace's photographs and scanning some—those it thinks are saleable—and will put those on the website for licensing. Roughly 6 to 10 per cent of the images have been scanned. (Tr. 351–54).

missing. (Tr. 169–88, 193–96; PX 2A).[16] Many of Grace's missing images are images of Jimmy Carter, Geraldine Ferraro, Walter Mondale, and other politicians from political campaigns from many years ago. (Tr. 742). The images Grace took of Christopher Reeve are not among the missing as Laffont returned all the negatives to Marsha Williams. (Tr. 648–49). Likewise, few, if any, images of Robin Williams are among the missing, as most of these images were returned to the Williams family or to Grace himself or they were not given to Sygma in the first place.[17]

For most of the stories that Grace shot while at Sygma, at least some of the images were returned, that is, some images for the particular story were returned. (PX 2A). The vast majority of the stories are news events and political events and campaigns from the 1970s and 1980s. Of the 732 stories shown on the partially returned stories list compiled by Grace, some 138 of the stories are of President Carter. (*See* PX 2A).

There were also a number of stories for which no images were returned at all. For a few of these stories some prints were returned (but no negatives or transparencies). All of these stories are from the 1970s and 1980s. (PX 13 at 13–14).

On perhaps half a dozen occasions after he had ended his relationship with Corbis Sygma, Grace found some of his images on Corbis's website. Each time he asked Corbis to remove the images and it did so. (Tr. 209–11).

**16.** In PX 2, Grace contends that 67,473 original images were never returned. This figure was calculated based on Grace's estimate or recollection of the number of rolls he shot for each story multiplied by 36 (for 36 shots on a roll) less the number of images returned. In the instances where he could tell that he did not finish a roll, he would use the number of the last shot. (*See* Tr. 271–78).

## DISCUSSION

I discuss subject matter jurisdiction, liability, and damages, in turn.

### A. *Jurisdiction*

This Court has subject matter jurisdiction over this case by virtue of the diversity of citizenship of the parties. Grace is and has been since 1995 a citizen of California. (Tr. 50–51). Corbis Sygma is a New York corporation, Sygma S.A.R.L. is a French corporation, and Corbis is a Washington corporation with its principal place of business in Seattle. (*See* Def. Pretrial Prop. Findings of Fact & Concl. of Law at p. 3).

### B. *Liability*

#### 1. *Applicable Law*

■ A bailment is a delivery of personal property by one to another, where, explicitly or implicitly, the latter agrees to return the property once the purpose of the bailment is fulfilled or the former requests the property back, or to otherwise deal with the property as the former instructs. *See Herrington v. Verrilli*, 151 F.Supp.2d 449, 457 (S.D.N.Y.2001) (applying New York law); 9 N.Y. Jur.2d *Bailments & Chattel Leases* § 1 (2005). A bailment is created when a bailee takes lawful possession of personal property and has a duty to account for it. *Martin v. Briggs*, 235 A.D.2d 192, 663 N.Y.S.2d 184, 187 (1st Dep't 1997).

**17.** (*See* Tr. 269 (Grace testifying that CBS Records "had all the film" of shoot of Williams); Tr. 308–09 (sale of images to Williams family as part of settlement of dispute); DX M (agreement, with schedule of images to be transferred to Williams family); DX L (return of 22 and 507 Williams slides to Grace on, respectively, September 14, 2004 and February 6, 2003)).

■ Where a bailment is for the mutual benefit of the parties, the bailee has a duty to exercise reasonable care in the handling of the property. *Ryan v. Aer Lingus*, 878 F.Supp. 461, 464 (S.D.N.Y. 1994); *Rosen v. Vill. Chevrolet, Inc.*, 63 Misc.2d 174, 311 N.Y.S.2d 230, 233 (N.Y. Civil Ct. Queens Co.1970) (in mutual benefit bailment, bailee must "exercise that degree of care which a reasonably careful owner of similar goods would exercise under the same circumstances"). When a bailee fails to return bailed property, the bailee is presumed negligent and to have failed to use reasonable care. *Ryan*, 878 F.Supp. at 464; *see Rosen*, 311 N.Y.S.2d at 234 (presumption of negligence arises from proof of bailment and failure to return property). The burden then shifts to the bailee to explain the loss. *Rosen*, 311 N.Y.S.2d at 234.

### 2. Application

■ Here, defendants do not seriously dispute liability; they dispute only the number of missing images and the value thereof. Clearly, a bailment was created. Sygma took lawful possession of Grace's images and had a duty to account for them. Once Grace terminated the relationship in May 2001, the bailment ended and Sygma was obliged to return the images. Although many were returned, many were not. Because this was a mutual benefit bailment, Sygma is presumed to have been negligent in failing to return the missing images. Defendants have not provided a sufficient explanation for the loss, and, indeed, the record shows that Sygma's system of keeping track of images was "completely inadequate." Hence, defendants are liable.

### C. Damages

#### 1. Applicable Law

■ Although the task of placing a value on photographs is a difficult one, the case law provides guidance. As the Second Circuit has recognized, under New York law, "the value of lost slides depends primarily on their uniqueness and the 'plaintiff's earning potential.'" *Gasperini v. Ctr. for Humanities, Inc.*, 149 F.3d 137, 141 (2d Cir.1998) (quoting *Lowit v. Consol. Edison Co.*, 234 A.D.2d 2, 650 N.Y.S.2d 152, 152 (1st Dep't 1996)). Factors bearing on a photographer's earning potential include: past earnings from use of the images; the photographer's reputation and expertise; the extent and nature of the market demand for images of this type; and the potential for competition. *Raishevich v. Foster*, 9 F.Supp.2d 415, 417 (S.D.N.Y.1998). In this case, another important factor is the purchase price for the acquisition of comparable photo collections. Finally, Grace relies heavily on the industry standard for liquidated damages for the loss of consigned transparencies.

■ The plaintiff has the burden of proving damages with reasonable certainty, but exactitude is not required, particularly when a precise calculation of damages is made difficult by the wrongdoer's conduct. *Id.*

### 2. Application

#### a) The Number of Missing Images

The threshold question is: how many images did Corbis fail to return? It is impossible to determine the precise number of images, for the record-keeping was essentially non-existent and Grace's calculations are only estimates. I conclude, however, that the number of missing images is substantially below 67,473, the number claimed by Grace, and that, more likely than not, the number is about 40,000. (*See* DX AA at 4). I reach these conclusions because some of Grace's estimates are high (for example, there was some

inadvertent double-counting (Tr. 391–99)); some images were undoubtedly returned to Grace over the course of the thirty years; and some of the images were not given to Sygma in the first place (for example, *Time* returned 2,000 images during the trial and *Newsweek* located some images after trial (*see* Def. Post–Trial Mem., Ex. 2, 3)). In any event, in light of my rulings below on damages, a precise number is not necessary.

#### b) *The Value of the Missing Images*

As for the value of the missing images, I consider the various factors set forth above. I then discuss plaintiff's alternative theories of damages. Finally, I determine the amount to be awarded.

#### i) *Uniqueness*

■ Although, as I conclude above, Grace had a "unique eye" and was one of the top photojournalists of his time, the vast majority of the missing images were not unique. Although it is true that the lost images cannot be replicated as they are photographs of moments in history years ago, *see Raishevich,* 9 F.Supp.2d at 418 ("a fleeting historical event ... by definition is incapable of recreation"), there are alternatives. Most of the lost images were news shots of events that attracted many other photographers. Grace had many competitors and many photojournalists covered news stories for the national magazines, newspapers, and wire services. Sygma itself had dozens of photographers, and there were numerous other photo agencies that competed with Sygma. There are other substantial collections of photographs that contain news shots from the 1970s and 1980s.

Moreover, Grace himself took many shots of most if not all of the news stories he covered. Many images have been returned for many of these stories, and for these stories some images are available for licensing.

Although the missing images surely do contain "selects," the majority are not unique in the sense that many were "out-takes." Many of the missing images are images Sygma chose not to send to clients. Many of the missing images undoubtedly were not usable for one reason or another (*e.g.,* they were duplicative, or the subject blinked or turned her head at the last moment, or the image is out of focus). Moreover, only a small percentage of any collection of photographs is placed into the licensing stream. Even Zuma is selecting only 6 to 10 per cent of Grace's images for scanning and licensing.

#### ii) *Plaintiff's Earning Potential*

The first consideration bearing on a plaintiff's earning potential is past earnings from use of the images. Here, there is an ample record. For the thirteen-year period from 1990 through 2002, for all fees earned from all of Grace's images licensed by Sygma, Grace earned an average of $11,002.48 per year. For the ten-year period from 1991 through 2000, with the revenues from the celebrity photos omitted, Grace earned an average of $5,881 per year. These averages, of course, provide guidance only. As a measure of future income, these numbers are high because they include revenue for all Grace's images, including revenues from the 33,000 images that have been returned to him—these images are available for licensing. On the other hand, the numbers are low—particularly for the later years—because more likely than not the income was reduced because many of the images had been lost and were not available for licensing.

The next consideration is the photographer's reputation and expertise. Grace was one of the best. But he has spent

little time as a photojournalist in the last fifteen years.

The next consideration is the nature and extent of the market demand for these kinds of images. There is still a demand for images of news events from the 1970s and 1980s, but that demand is decreasing with the passage of time. The income stream from these images will not remain constant for the next thirty years; rather, the income stream will surely decline as the images age and the news stories in question fade into history. It is always possible, of course, that future events will rekindle interest in past events, but this possibility is not a basis for significantly increasing any damages award.

The next consideration is the potential for competition. As already discussed, Grace's images compete with images of other accomplished photojournalists, and there are many of them. Moreover, there are a number of photo licensing agencies and stock photo agencies with their own images to license. Hence, there is significant competition.

### iii) *The Sales of Other Collections*

The licensing rights to the entire Sygma collection—some 40 million images, including Grace's images—cost Corbis $12.5 million, or approximately $.31 per image. The copyrights to the 11 million images in the Bettmann collection sold for $13.5 million, or about $1.23 per image. The copyrights to the 600,000 images in the Turnley collection (which was edited before the acquisition) sold for $2.3 million, or $3.83 an image.

These numbers are relevant and I take them into account. On the other hand, the circumstances are different: the collections are different and, unlike here, the transactions involved willing buyers and willing sellers. Grace did not want to sell his images.

### iv) *The Liquidated Damages Provision*

██ The industry standard in the 1970s and 1980s for a lost transparency that had been delivered to a client on consignment was $1,500. Some courts have accepted this as a reasonable value for lost images. *See, e.g., Gasperini,* 149 F.3d at 141 (affirming district court's upholding of jury verdict awarding $1,500 per slide for 240 lost slides that were of "superior quality," "unique," and for the most part "irreplaceable"); *Lowit,* 650 N.Y.S.2d at 152–53 (affirming judgment on jury verdict awarding $1,500 per slide for 49 lost slides, where slides were "unique" and that amount comported with plaintiff's earnings potential); *Girard Studio Group, Ltd. v. Young & Rubicam, Inc.,* 147 A.D.2d 357, 536 N.Y.S.2d 790, 790 (1st Dep't 1989) (reducing jury verdict from $240,000 to $120,000, or $1,500 each, for 80 lost slides).

The standard does not apply in this case and would lead to an absurd result. At trial, Grace argued that he is entitled to recover $1,500 times 67,000 images—or $100.5 million. (Tr. 1070). Even with the number of missing images found by this Court—40,000—the recovery would be $60 million. Both those sums far exceed what was paid for the licensing rights to Sygma's entire collection of 40 million images (which included Grace's images) and for the copyrights to collections of 11 million and 600,000 images—combined. Moreover, the 40,000 images here were not "unique" and "irreplaceable." What a client was willing to stipulate to as compensation in the event of the loss of an image when receiving a few "selects" on consignment to review under the pressure of a deadline is not relevant to a situation involving 40,000 images.

### v) *Plaintiff's Theories*

Grace's valuation expert, Jeffrey D. Smith, ranked Grace's images into three

categories and opined that they were worth $5,000, $2,500, or $1,500–$2,000 each, depending on the ranking. (PX 31). I reject his testimony. He was evasive and non-responsive, and his testimony did not make sense. Although he tried to fudge by saying he could not "predict to the dollar," he seemed to be suggesting, for example, that for the 511 shots missing from the Poland 1981–1982 story, Grace was entitled to an award of $5,000 per image or a total of more than $2.5 million—for these 511 images alone. (Tr. 534–37). He also never looked at the licensing revenue that Grace's photographs actually earned, which clearly is a relevant consideration. (Tr. 547–48).

As an alternative, Grace proposes a theory that ranks 5 per cent of the images (assuming 66,653 missing images) as "super selects" at a value of $1,500 each, 5 per cent as "selects" at a value of $750 each, and the remaining 90 per cent at a value of $75 each, for a total recovery of $11,996,850. (Pl. Post–Trial Br. at 32–33). This theory is also rejected as unreasonable. This sum is almost what Corbis paid for the entire Bettmann collection. The annual interest that could be earned on this sum would be more then ten times what Grace was earning a year, on average, from the licensing of all his images.

As a final alternative, Grace proposes a theory that values 10 per cent of the missing images (again assuming 66,653 images) at $1,500 each, for a total recovery of $9,997,500. (*Id.* at 33). This theory is also rejected as unreasonable, for the same reasons as above.

vi) *The Court's Award*

I conclude that defendants' proposal of looking at Grace's licensing income is reasonable, but only as a starting point. At a minimum, Grace should be compensated for what he would have earned if the missing images had been available for licensing in the past and if they were available for licensing in the future. But he should be awarded something more, for the loss of the licensing income is only part of his damages. The images have a value beyond just the licensing income—Grace no longer has these images to view or hold or enjoy or otherwise do with as he wishes.

Accordingly, taking into account all of the above, I award Grace damages as follows:

First, he is awarded $8,000 a year for four-and-a-half years, or $36,000, to account for lost licensing income from July 1, 2001, when his images should have been returned, to date.

Second, he is awarded an additional $436,000 for the loss of the images, based on a value of $100 per image for 4,000 images (I conclude 10 per cent are "selects") and $1 an image for the remaining 36,000 images.

The above numbers take into account pre-judgment interest. No additional award is allowed for claims for holding fees or improper deductions or any other expenses or damages.

*CONCLUSION*

For the foregoing reasons, judgment will be entered in favor of Grace in the amount of $472,000, with costs but without fees. No further injunctive relief will be awarded. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.